16-2946 (L)
*Allco Fin. Ltd. v. Robert J. Klee, et al.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2016

Argued: December 9, 2016

Decided: June 28, 2017

Docket Nos. 16-2946, 16-2949

―――――――――――――――――――――

ALLCO FINANCE LIMITED

*Plaintiff-Appellant*,

- v. -

ROBERT J. KLEE, in his official capacity as Commissioner of the Connecticut
Department of Energy and Environmental Protection,

*Defendant-Appellee*,

KATHERINE S. DYKES, JOHN W. BETKOSKI, III, and MICHAEL CARON, in
their official capacities as Commissioners of the Connecticut Public Utilities
Regulatory Authority,

*Defendants-Appellees.**

―――――――――――――――――――――

Before: CALABRESI, RAGGI, LYNCH, *Circuit Judges*.

―――――――――――――――――――――

_____

* The Clerk of Court is respectfully directed to amend the caption to conform to the caption above.

1

Thomas Melone, Allco Renewable Energy Limited, New York, New York, *for Plaintiff-Appellant*.

Robert D. Snook, Assistant Attorney General, Hartford, Connecticut, *for* George Jepsen, Attorney General for the State of Connecticut, *for Defendant-Appellee* Robert J. Klee.

Seth Hollander, Assistant Attorney General (Clare E. Kindall, Assistant Attorney General, *on the brief*), New Britain, Connecticut, *for* George Jepsen, Attorney General for the State of Connecticut, *for Defendants-Appellees* Katherine S. Dykes, John W. Betkoski, III, and Michael Caron.

Ann H. Rubin, Carmody Torrance Sandak & Hennessey LLP, Waterbury, Connecticut, *for Amicus Curiae* The Connecticut Light and Power Company, DBA Eversource Energy, *in support of Defendants-Appellees*.

Gene Grace (Julia Dreyer, *on the brief*), American Wind Energy Association and RENEW Northeast, Washington, D.C., *for Amicus Curiae* American Wind Energy Association, *in support of Defendants-Appellees*.

M. Elaine Meckenstock, Deputy Attorney General (Robert W. Byrne, Senior Assistant Attorney General, Gavin G. McCabe, Supervising Deputy Attorney General, and Melinda Pilling, Deputy Attorney General, *on the brief*), Oakland, California, *for* Xavier Becerra, Attorney General, California Office of the Attorney General, *for Amici Curiae* States of Massachusetts, New York, Oregon, Vermont, and Washington, and the California Air Resources Board, *in support of Defendants-Appellees*.

CALABRESI, *Circuit Judge*:

Plaintiff-Appellant Allco Finance Limited ("Allco" or "Plaintiff") appeals from a final judgment entered by the United States District Court for the District of Connecticut (Haight, *J.*), which dismissed two of Allco's related, but not formally consolidated, Complaints ("the Complaints"). The Complaints focus on Connecticut's implementation of Connecticut Public Acts 13-303 and 15-107, which empower the state's energy regulator to solicit proposals for renewable energy generation, to select winning bids from such solicitations, and then to "direct" Connecticut's utilities to "enter into" wholesale energy contracts with the winning bidders. One of the Complaints also challenges a separate Connecticut program, the Renewable Portfolio Standard, which requires Connecticut's utilities either to produce renewable energy themselves or to buy renewable energy credits from other renewable energy producers located in the region.

Allco brought these two actions against the Commissioners of Connecticut's state energy regulators in their official capacities ("the Defendants"), arguing that the state programs violate federal law and the dormant Commerce Clause of the United States Constitution, and that Connecticut's implementation of the programs has injured Allco. In addition to seeking damages and fees under 42 U.S.C. §§ 1983 and 1988, Allco sought declaratory judgments that Connecticut regulators had violated federal law in their implementation of the programs, and that any

3

contracts that arose out of solicitations conducted under Public Acts 13-303 and 15-107 were void. Allco also sought equitable relief in the form of an injunction barring Connecticut from violating federal law in any pending or future solicitation.

In each action, the Defendants moved to dismiss the Complaint for lack of standing and for failure to state a claim. Allco opposed these motions, and moved for preliminary injunctive relief. On August 18, 2016, in a single omnibus decision, the district court granted Defendants' motions to dismiss the Complaints and denied Allco's motions for injunctive relief as moot. Allco filed a timely notice of appeal on August 23, 2016, and then, on October 3, 2016, filed a motion for an emergency injunction pending this appeal. On November 2, 2016, a motions panel of this court granted the emergency injunction and expedited this appeal. We heard oral arguments on December 9, 2016, and vacated the emergency injunction on December 12, 2016.

We now AFFIRM the district court's judgment. We hold: (1) that Allco failed to state a claim that Connecticut's renewable energy solicitations conducted pursuant Connecticut Public Acts 13-303 and 15-107 are preempted by federal law, and (2) that Allco failed to state a claim that Connecticut's Renewable Portfolio Standard program violates the dormant Commerce Clause.

4

# I. BACKGROUND

**A. The Federal Power Act and the Public Utility Regulatory Policies Act**

The Federal Power Act ("FPA") gives the Federal Energy Regulatory Commission ("FERC") exclusive authority to regulate the sale of electric energy at wholesale in interstate commerce. *See* 16 U.S.C. § 824(b)(1); *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1292 (2016). A "sale of electric energy at wholesale" is defined as a "sale of electric energy to any person for resale." 16 U.S.C. § 824(d). The FPA requires "FERC to oversee all prices for those interstate transactions and all rules and practices affecting such prices," and further "provides that 'all rates and charges made, demanded or received by any public utility for or in connection with' interstate transmissions or wholesale sales . . . must be 'just and reasonable.'" *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 767 (2016) ("*EPSA*") (quoting 16 U.S.C. § 824d(a)). "If 'any rate [or] charge,' or 'any rule, regulation, practice, or contract affecting such rate [or] charge' falls short of that standard," FERC "must rectify the problem: It then shall determine what is 'just and reasonable' and impose 'the same by order.'" *Id.* (quoting 16 U.S.C. § 824e(a)) (alterations in original). Although the FPA "places beyond FERC's power, leaving to the States alone, the regulation of 'any other sale'—*i.e.*, any retail sale—of electricity," *id.* at 762 (quoting 16 U.S.C. § 824(b)),

5

states may not regulate interstate wholesale sales of electricity unless Congress creates an exception to the FPA. 16 U.S.C. § 824(b).

The Public Utility Regulatory Policies Act[1] ("PURPA") contains such an exception, permitting states to foster electric generation by certain power production facilities ("qualifying facilities" or "QFs") that have no more than 80 megawatts of capacity and use renewable generation technology. *Id.* § 824a–3; *see id.* § 796(17)(A). A state may regulate wholesale sales of electricity made by QFs by requiring utilities to purchase power from QFs at the utilities' "avoided costs," which are the costs that the utility would have otherwise incurred in procuring the same quantity of electricity from another source. *See id.* § 824a–3(b); 18 C.F.R. § 292.304(b)(2). Section 210(a) of PURPA, 16 U.S.C. § 824a-3(a), also provides all QFs with a guaranteed right to sell their energy and capacity to electricity utilities at the utilities' avoided costs. *See* 16 U.S.C. § 824a-3(b), (d); 18 C.F.R. § 292.304(b)(2); *see also Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 404–06, 417 (1983). PURPA imposes obligations on each state regulatory authority to implement FERC's PURPA regulations, 16 U.S.C. § 824a–3(f)(1), and provides a private right of action to QFs to enforce a state's obligations

---

[1] Although PURPA is technically one of several amendments to the Federal Power Act, *see* 16 U.S.C. §§ 791–828; PURPA, Pub. L. No. 95–617, 92 Stat. 3117 (1978) (codified in part at 16 U.S.C. § 824a–3), any reference to the "Federal Power Act" in this opinion excludes the sections of the Act enacted under PURPA.

6

under PURPA, *see id.* § 824a–3(h)(2)(B); *FERC v. Mississippi*, 456 U.S. 742, 772 & n.2 (1982).[2]

**B. The Interstate Electricity Market**

Three general categories of actors in the interstate electricity market are relevant to this opinion: generators, load serving entities (LSEs), and transmitters. *See Hughes*, 136 S. Ct. at 1292. Generators include power plants and other sources of electricity production. LSEs, otherwise known as utilities, sell electricity at retail to end users. *Id.* Transmitters transmit the electricity from generators to the LSEs. *Id.*

"Until relatively recently, most state energy markets were vertically integrated monopolies—*i.e.*, one entity, often a state utility, controlled electricity generation, transmission, and sale to retail consumers." *Id.* Over the past few decades, however, many states, including Connecticut, have deregulated their

---

[2] The private right of action under PURPA has the following structure. First, "qualifying cogenerator[s]," such as Allco, "may petition [FERC] to enforce" a state's requirements to comply with PURPA. § 824a–3(h)(2)(B). Then, "[i]f the Commission does not initiate an enforcement action . . . against a State regulatory authority," such as the Connecticut Department of Energy and Environmental Protection, "within 60 days following the date on which a petition is filed . . . , the petitioner may bring an action in the appropriate United States district court to require such State regulatory authority . . . to comply with such requirements." *Id.* The district court may then "issue such injunctive or other relief as may be appropriate." *Id.* Additionally, FERC "may intervene as a matter of right in any such action." *Id.; see Allco Fin. Ltd. v. Klee*, 805 F.3d 89, 92 (2d Cir. 2015), *as amended* (Dec. 1, 2015) ("*Allco II*").

energy markets. *Id.* In deregulated markets, LSEs purchase electricity at wholesale from independent power generators. *Id.* In order "[t]o ensure reliable transmission of electricity from independent generators to LSEs, FERC has charged nonprofit entities, called Regional Transmission Organizations (RTOs) and Independent System Operators (ISOs), with managing certain segments of the electricity grid." *Id*. The New England ISO ("ISO-NE"), the transmitter involved in this case, manages the grid in most of New England, including all of Connecticut.

Given the changes to the energy market that came with deregulation, FERC altered its regulatory methods, and today it "often forgoes the cost-based rate-setting traditionally used to prevent monopolistic pricing. [FERC] instead undertakes to ensure 'just and reasonable' wholesale rates by enhancing competition—attempting . . . 'to break down regulatory and economic barriers that hinder a free market in wholesale electricity.'" *EPSA*, 136 S. Ct. at 768 (quoting *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 536 (2008)). Thus, in Connecticut and other states that have deregulated their energy markets, interstate wholesale transactions typically occur through two FERC-regulated mechanisms. The first mechanism is bilateral contracting, whereby LSEs agree to purchase a certain amount of electricity from generators at a particular rate over a specified period of time. *Hughes*, 136 S. Ct. at 1292. After the parties have agreed to contract terms, FERC may review the rate to ensure it is

"just and reasonable" under 16 U.S.C. 824d(a). *See Morgan Stanley*, 554 U.S. at 531–32. If these bilateral contracts are made in good faith and are the result of arm's-length negotiations, FERC presumes their terms are reasonable. *See NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 167, 175 n.4 (2010); *Morgan Stanley*, 554 U.S. at 545–48. Second, RTOs and ISOs administer a number of competitive wholesale auctions. FERC extensively regulates the structure and rules of such auctions, in order to ensure that they produce just and reasonable results. *See Hughes*, 136 S. Ct. at 1293–94; *EPSA*, 136 S. Ct. at 769.

Allco's first claim is that Connecticut's renewable energy solicitation program conducted pursuant to Connecticut Public Acts 13-303 and 15-107—which aims to encourage the creation of new bilateral wholesale energy contracts between LSEs and generators—violates the FPA and PURPA. As we shall see, Allco has made several attempts to put forth that argument.

**C. Connecticut's Renewable Energy Procurement Program**

1. The 2013 RFP, *Allco I*, and *Allco II*

In 2013, the Connecticut Department of Energy and Environmental Protection ("DEEP"), which oversees energy policy and planning in Connecticut, *see* Conn. Gen. Stat. § 16a-3, issued a memorandum setting forth the state's first "Comprehensive Energy Strategy," which included findings and policy goals to

direct the state's energy and environmental planning. *2013 Comprehensive Energy Strategy for Connecticut*, Dep't of Energy and Envtl. Prot. (Feb. 19, 2013), *available at* http://www.ct.gov/deep/lib/deep/energy/cep/2013_ces_final.pdf ("2013 CES"). The 2013 CES articulates a commitment (a) to promoting "diversification" of Connecticut's energy generation sources in order to mitigate "price and reliability risks," *id*. at 81–82, and (b) to increasing renewable energy generation in the state and in adjacent states in order to meet the requirements of various environmental regulatory programs, such as the Global Warming Solutions Act and the Regional Greenhouse Gas Initiative, *id.* at 76 & n.20.

The Connecticut legislature enacted a statute that authorized the DEEP Commissioner, "in accordance with the policy goals outlined in the [2013 CES], adopted pursuant to [Conn. Gen. Stat. § 16a-3d]," (a) to solicit proposals for renewable energy, (b) to select winners of the solicitation, and (c) to "direct [Connecticut's utilities] to enter into" bilateral contracts, called "power purchase agreements," with the chosen winners "for energy, capacity and environmental attributes, or any combination thereof, for periods of not more than twenty years." Act Concerning Connecticut's Clean Energy Goals, 2013 Conn. Pub. Acts 13–303, § 6 (codified at Conn. Gen. Stat. § 16a-3f) ("Section 6").[3] Any contracts that were

---

[3] As will be discussed further below, Allco alleges that this statutory authorization to "direct" utilities to "enter into" bilateral contracts, 2013 Conn. Pub. Acts 13-303, effectively allows the DEEP Commissioner to "compel" utilities

successfully negotiated between utilities and winning bidders also required the approval of the Connecticut Public Utilities Regulatory Authority ("PURA"), *id.*, the agency charged with regulating the two principal utility companies in Connecticut.

In July 2013, the DEEP Commissioner solicited proposals, under Section 6, from providers of renewable energy (the "2013 RFP"). Allco, an owner, operator, and developer of various solar projects throughout the country, submitted proposals for five solar projects, each of which had less than of 80 megawatts of capacity, and therefore were QFs under PURPA. The DEEP Commissioner did not select Allco's projects. Instead, it chose two others: (a) a wind project located in Maine called Number Nine Wind—which, with 250 megawatts of capacity, was too large to be a QF—and (b) a QF solar project located in Connecticut, called Fusion Solar, which was independent of Allco. The DEEP Commissioner then "directed" the Connecticut utilities to execute power purchase agreements with the generators that had been selected. PURA subsequently reviewed the resulting contracts, and approved them.

Disappointed by its failure to receive a contract through the 2013 RFP, Allco sued the DEEP Commissioner in the United States District Court for the District of Connecticut, alleging that the DEEP Commissioner's implementation of Section 6,

to accept the terms of selected proposals. Complaint ¶ 30, Allco Fin. Ltd. v. Klee, No. 3:15-cv-608 (D. Conn. Apr. 26, 2015), ECF No. 1 (*"Allco III* Compl.").

by means of the 2013 RFP, was preempted by the FPA. Allco complained that the Commissioner's implementation of the 2013 RFP had the effect of "fixing" wholesale energy prices, a power that Allco alleged was reserved to FERC under the FPA. Allco argued that the DEEP Commissioner's actions could avoid preemption by the FPA only if they were conducted in compliance with the limited authority granted to Connecticut by PURPA to regulate some wholesale interstate sales, and that the 2013 RFP failed to operate within the scope of this authority.

In addition to seeking damages and fees under 42 U.S.C. §§ 1983 and 1988, Allco sought equitable relief to void the contract with Number Nine Wind[4] and to enjoin the DEEP Commissioner from violating the FPA or PURPA in any similar procurement process in the future.

The district court dismissed the complaint for two independent reasons. First, it held that Allco lacked standing because its injuries were not within the FPA or PURPA's "zone of interests," and because its injuries were not likely to be redressed by a favorable judgment. *Allco Fin. Ltd. v. Klee*, No. 13–cv–1874, 2014 WL 7004024, at *3–6 (D. Conn. Dec. 10, 2014) ("*Allco I*"). Alternatively, the district court concluded that Allco's claim failed on the merits because the State Defendants' "implementation of Section 6 does not seek to regulate wholesale

---

[4] Allco explained that it did not seek to invalidate the Fusion Solar contract, because Fusion Solar was a QF under PURPA. *See Allco Fin. Ltd. v. Klee*, No. 13-cv-1874, 2014 WL 7004024, at *7 n.7 (D. Conn. Dec. 10, 2014) ("*Allco I*").

energy sales but rather is a permissible regulation of utilities under the State's jurisdiction." *Allco I*, 2014 WL 7004024, at \*10.

On November 6, 2015, a panel of our court affirmed the district court's dismissal of the *Allco I* complaint on "alternative grounds." *Allco Fin. Ltd. v. Klee*, 805 F.3d 89, 91 (2d Cir. 2015), *as amended* (Dec. 1, 2015) ("*Allco II*"). Specifically, the panel determined (1) that PURPA's private right of action under 16 U.S.C. § 824a–3(h)(2)(B), which was created to vindicate any rights conferred by PURPA, foreclosed Allco's claims under 42 U.S.C. §§ 1983 and 1988; (2) that Allco had failed to exhaust its administrative remedies under 16 U.S.C. § 824a–3(h)(2)(B), a prerequisite for its equitable action seeking to enjoin the DEEP Commissioner from conducting future procurements that violate the FPA and PURPA; and (3) that Allco lacked standing to bring a preemption action seeking solely to void the contracts awarded to the successful 2013 RFP bidders, because doing so would "not redress its injury, *i.e.*, its not being selected for a Section 6 contract." *Allco II*, 805 F.3d at 94–98.

2. The 2015 RFP and the *Allco III* Complaint

While the *Allco II* appeal was pending, Allco filed another Complaint in the District of Connecticut, this time against both the DEEP Commissioner and the PURA Commissioners. The suit—which we will call *Allco III*—is one of the two suits now before us on appeal.

The Complaint in *Allco III* focused on a draft RFP that the DEEP Commissioner issued on February 26, 2015, soliciting a second round of interstate wholesale energy generation proposals ("the 2015 RFP") under Sections 6 and 7 of Connecticut Public Act 13-303, as well as Connecticut Public Act 15-107.[5] This solicitation was to be closed to generators with less than 20 megawatts of capacity and open to bidders with more than 80 megawatts of capacity—*i.e.*, it excluded bids from smaller QFs and accepted bids from renewable energy generators too large to be QFs. Although the 2015 RFP was to be accompanied by a contemporaneous RFP open exclusively to bidders with 2–20 megawatts of capacity, the amount of generation capacity solicited through that RFP was smaller, and so Allco claimed it presented a less-valuable opportunity for Allco's facilities.

The draft 2015 RFP included new language stating that, "[t]his RFP process . . . does not obligate [utilities] to accept any bid." *Allco III* App. at 29. Allco nonetheless alleged in its Complaint that DEEP "plans to issue the final request for proposals, which is likely to be in substantially the same form as the draft RFP . . . , in the spring of 2015 and *compel* wholesale energy transactions soon

---

[5] Section 7 of Public Act 13-303 authorizes the DEEP Commissioner to select proposals including not only "Class I" renewable energy sources, but also large-scale hydropower. *See* Conn. Gen. Stat. § 16a-3g. Public Act 15-107 further authorized the DEEP Commissioner to solicit proposals including certain energy storage systems. *See id*. § 16a-3j.

after it completes its review of proposals." Complaint ¶ 30, Allco Fin. Ltd. v. Klee, No. 3:15-cv-608 (D. Conn. Apr. 26, 2015), ECF No. 1 (*"Allco III* Compl.") (emphasis added).

Allco's preemption argument in *Allco III*, with respect to the 2015 RFP, thus differed slightly from the preemption argument it made against the 2013 RFP in *Allco I* and *Allco II*. Instead of focusing on the allegation that Connecticut violated PURPA and the FPA by "fixing" wholesale rates outside of PURPA, Allco put forth the theory that Connecticut violated PURPA and the FPA because "the outcome of the . . . RFP process will likely be the Commissioner's decision *to force* a utility to enter a wholesale power contract." *Allco III* Compl. ¶ 43 (emphasis added). According to Allco, this "compulsion of transactions for wholesale transmissions services," *id*. ¶ 39, constitutes state regulation of wholesale sales not authorized by PURPA, and therefore in violation of the FPA, *id*. ¶¶ 43–45. Allco also argued that (1) minimum generation capacity limits placed on the generators allowed to submit bids into the 2015 RFP and (2) the fees charged to generators submitting bids constituted a regulation of the interstate wholesale energy market in violation of the FPA. *Id*. ¶¶ 47, 53. Additionally, Allco attacked Connecticut's implementation of its Renewable Portfolio Standard program (*see infra* Section I.C, discussing this claim), *id*. ¶¶ 63–71, and asserted §§ 1983 and 1988 claims similar to those in *Allco I*, *id*. ¶¶ 72–80.

15

3. FERC's Notice of Intent Not To Act, and the *Allco IV* Complaint

On November 9, 2015, several days after we issued our decision in *Allco II*, and while the *Allco III* suit was still before the district court, Plaintiff filed with FERC a petition for enforcement under PURPA, *see* 16 U.S.C. § 824a-3(h), thereby pursuing the administrative remedy that the *Allco II* panel held had not been properly exhausted. Allco's petition alleged that both the 2013 RFP and the 2015 RFP violated or would violate PURPA, asked FERC to invalidate the 2013 RFP, and also asked FERC to enjoin Connecticut from proceeding with the 2015 RFP. Allco Renewable Energy Ltd., Notice of Petition for Enforcement, FERC Docket No. EL16-11-000 (filed Nov. 9, 2015). On January 8, 2016, FERC issued a Notice of Intent Not To Act on Allco's petition. Allco Renewable Energy Ltd., Notice of Intent Not To Act, FERC Docket No. EL16-11-000, 154 FERC ¶ 61,007 (2016). The Notice expressed no opinion on the merits of Allco's claims under PURPA.

Claiming that it had now exhausted its administrative remedies regarding both the 2013 RFP and the 2015 RFP, Allco filed, on March 30, 2016, the second Complaint at issue in this appeal, which we will call *Allco IV*. While the *Allco III* Complaint concerned only the draft 2015 RFP, the *Allco IV* Complaint, in addition to addressing the (by then, finalized) 2015 RFP, also reached back to the 2013

RFP. The Complaint sought to invalidate the Number Nine Wind contract that resulted from the 2013 RFP and to enjoin the 2015 RFP from proceeding.

As in the *Allco III* Complaint, the *Allco IV* Complaint asserted that Connecticut was violating PURPA and the FPA by issuing an RFP under which Connecticut would "compel[]" and "order" the utilities to enter into wholesale energy contracts on a particular set of proposed terms. Complaint ¶¶ 8, 28, Allco Fin. Ltd. v. Klee, No. 3:16-cv-508 (D. Conn. Mar. 30, 2016), ECF No. 1 ("*Allco IV* Compl."). Allco also argued that both the 2013 RFP and the 2015 RFP, by virtue of the restrictions and fees imposed on bidders, regulated wholesale sales of electricity, and that because they did not fit within the limited regulatory authority over wholesale sales granted to Connecticut by PURPA, they violated the FPA.[6] *Id.* ¶¶ 7–8, 48.

On July 11, 2016, Allco notified the district court that because the Number Nine Wind contract had been terminated for reasons unrelated to Allco's lawsuits, Allco's claims regarding the 2013 RFP were moot and it was proceeding solely on its claims related to the 2015 RFP.[7]

---

[6] Plaintiff subsequently moved for a temporary restraining order and a preliminary injunction in *Allco III*. These sought to compel Defendants to cease all activity in connection with the 2015 RFP.

[7] Allco's only remaining requests for relief pertaining to the 2013 RFP—*i.e.*, its request for a declaratory judgment that the 2013 RFP was preempted—do not require an analysis separate from that which we apply to its claims related to the 2015 RFP. We therefore only consider Allco's claims that pertain to the 2015 RFP.

**D. Connecticut's Renewable Portfolio Standard Program**

In its Complaint in *Allco III*, Allco claims that a separate Connecticut program, the Renewable Portfolio Standard ("RPS"), Conn. Gen. Stat. § 16-245a(b), violates the dormant Commerce Clause.

Connecticut's RPS program requires utilities to have an increasing percentage of their generation portfolios be "generated from" renewable energy. Conn. Gen. Stat. § 16-245a(a). Connecticut's RPS program allows utilities to satisfy this requirement either by generating renewable energy themselves, or by purchasing renewable energy certificates ("RECs"). *See id.* § 16-245a(b). (Each REC represents one megawatt-hour of renewable energy produced by a third-party generator.) [8]

"RECs are inventions of state property law whereby the renewable energy attributes are 'unbundled' from the energy itself and sold separately." *Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d 183, 186 (2d Cir. 2008) (per curiam). As such, different states define RECs differently, focusing on various attributes which they deem to be especially relevant.

---

[8] Several other states have adopted similar programs. *See* Brief for Massachusetts et al. as *Amici Curiae* 2. ("Twenty-nine States currently have RPS programs. Many of those States, including State Amici here, allow the use of state-created RECs for compliance with at least part of their RPS programs' renewable energy requirements.").

Connecticut's RPS program defines two types of RECs that count towards the requirement placed on Connecticut utilities. Each of these involves particular kinds of renewable energy generation technology that Connecticut is seeking to encourage, *see* Conn. Gen. Stat. §§ 16-245a(b) (limiting eligible RECs to those produced by "Class I" and "Class II" generators), 16-1(a)(20)–(21) (defining "Class I" and "Class II" RECs based on the type of renewable power generation technology used). And each of these must be issued and tracked by the New England Power Pool Generation Information System ("NEPOOL-GIS"), *see id.* § 16-245a(b), an independent association of electric utilities, which was founded in 1971, and which is supervised by FERC, *see Braintree Elec. Light Dep't v. FERC*, 550 F.3d 6, 9 (D.C. Cir. 2008).

The first type is a REC that is generated by a renewable energy source located within the jurisdiction of ISO-NE (*i.e.*, Connecticut, Massachusetts, Vermont, New Hampshire, Rhode Island, and most of Maine). The second type is a REC that is issued by NEPOOL-GIS for energy that may be imported into the ISO-NE grid from generators in adjacent control areas, pursuant to NEPOOL-GIS Operating Rule 2.7(c). Conn. Gen. Stat. § 16-245a(b). These adjacent control areas include ISO-New York, the Northern Maine Independent System Administrator, Inc., and Quebec and New Brunswick in Canada. Although Connecticut utilities are free to purchase RECs that do not meet these requirements—for example,

RECs from generators which cannot transmit their energy into the ISO-NE grid pursuant to NEPOOL-GIS Rule 2.7(c)—such RECs will not count towards their requirements under the RPS.

Connecticut has articulated several reasons for incorporating these geographic limitations into its RPS program. Central among these is the State's interest in encouraging the development of new renewable energy generation facilities that are able to transmit their electricity into the ISO-NE grid. *See* The Conn. Dep't of Energy & Envtl. Prot., *Restructuring Connecticut's Renewable Portfolio Standard*, at i (Apr. 26, 2013), http://www.ct.gov/deep/lib/deep/energy/rps/rps_final.pdf; 2013 CES at 81–82. Connecticut argues that increased in-region renewable energy production would improve air quality for its citizens and protect them from price and supply shocks that could result if, for example, there was a natural gas shortage or a nuclear power plant were to go off-line. *See* 2013 CES at 82. The state contends that placing regional limitations on RECs, if they are to satisfy the RPS requirement, is necessary if the program is to help increase the development of renewable generation facilities that are capable of effectuating these and similar goals.

Plaintiff, in its *Allco IV* Complaint, argues that it has been injured by two different features of Connecticut's RPS program, both of which, Plaintiff claims, amount to discriminatory "regional protectionism" in violation of the dormant

Commerce Clause. First, Allco alleges that it has a solar power facility in Georgia that has been discriminated against by Connecticut's RPS program insofar as Connecticut utilities cannot satisfy the RPS program's requirements by purchasing the Georgia RECs. Second, Allco argues that it has been injured by the fact that renewable energy generators in adjacent control areas—though able to sell qualifying RECs—must pay a fee to transmit their energy into the ISO-NE grid in order to sell their RECs to Connecticut utilities pursuant to NEPOOL GIS Rule 2.7(c). Allco asserts that it owns such a renewable facility in New York, and that it "will not deliver its electricity into the ISO-New England control area because of the additional cost burdens involved in doing so." *Allco III* Compl. ¶ 34.

**E. The District Court's Decision in *Allco III* and *Allco IV***

On August 18, 2016, the district court dismissed both of Allco's Complaints, with prejudice, in a single ruling. *Allco Fin. Ltd. v. Klee*, No. 3:15-CV-608, 2016 WL 4414774, at *25 (D. Conn. Aug. 18, 2016).

With regard to Allco's preemption claims, the district court dismissed them for lack of Article III standing, finding that even though Allco had exhausted its administrative remedies under PURPA,[9] Allco nonetheless failed to demonstrate

---

[9] The district court reviewed the enforcement request made by Allco to FERC and concluded that it was sufficiently broad to satisfy the exhaustion requirement with respect to both the 2013 RFP and the 2015 RFP, and that Allco therefore had satisfied the jurisdictional prerequisite we noted in *Allco II*. *Allco*

21

injury-in-fact or redressability. *Id.* at \*19. With regard to Allco's dormant Commerce Clause claim, the district court found that Allco had standing to challenge Connecticut's RPS program. *Id.* at \*22. It nonetheless dismissed the claim on the grounds that "the dormant Commerce Clause does not apply . . . because the RPS [program] creates a market for RECs, rather than impeding a previously existing national market. Furthermore, Connecticut is not obligated to pass the benefits of its subsidy program without restriction to those producing clean energy in Georgia." *Id.* at \*25. Finally, having held that Allco's preemption and dormant Commerce Clause claims were not viable, the district court dismissed Allco's §§ 1983 and 1988 claims, and denied its motion for preliminary injunctive relief as moot. *Id.*

Allco timely appealed on August 23, 2016, challenging the district court's dismissal of its preemption and dormant Commerce Clause claims, the district court's denial of its request for a preliminary injunction, and the district court's decision to dismiss the Complaints with prejudice.

---

*Fin. Ltd. v. Klee*, No. 3:15-CV-608, 2016 WL 4414774, at \*7 (D. Conn. Aug. 18, 2016); *see Allco II*, 805 F.3d at 97.

## II. DISCUSSION

### A. Standards of Review

We review *de novo* a district court's dismissal of a complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Klein & Co. Futures, Inc. v. Bd. of Trade*, 464 F.3d 255, 259 (2d Cir. 2006); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* On *de novo* review, "[w]e are entitled to affirm the judgment on any basis that is supported by the record." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014).

### B. Preemption Claim

#### 1. Standing

To establish Article III standing, Allco must demonstrate: "(1) *injury-in-fact*, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2)

*causation* in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106–07 (2d Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). In its Complaints, Allco proffers several theories through which it has suffered injury under the 2015 RFP. For example, it asserts that standing is conferred by PURPA, the QF status of its facilities, reduced demand for electricity it generates, and the charging of fees as well as the disqualification of certain Allco facilities from the 2015 RFP. Because we find that the last of these theories establishes a basis for Article III standing, we do not address the others.

a. Injury-in-Fact and Causation

Allco alleges, *inter alia*, that it has suffered an injury-in-fact because its smaller generating facilities were excluded from the 2015 RFP by virtue of that RFP's minimum size requirement, and because the RFP imposed unlawful fees on bidders—both of which, it alleges, violate the FPA. According to Allco, had the 2015 RFP been conducted in accordance with the FPA and PURPA, Connecticut would have been required to accept bids placed by Allco's smaller facilities, and would have been unable to charge bidding fees. We find these claimed injuries to be sufficiently "concrete" and "particularized" to qualify as injuries-in-fact. *See*

24

*Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548–50 (2016).[10] Allco's asserted injuries are also clearly "fairly traceable to the challenged conduct" of the Defendants, who structured and implemented the 2015 RFP. *Id.* at 1547.

b. Redressability

To satisfy the redressability requirement of Article III standing, the plaintiff must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). The redresses that Allco requests

[10] Defendants argue that these injuries are not sufficient to establish standing because the 2015 RFP does not violate federal law. This, however, is a merits issue, which we need not decide in analyzing whether Allco has standing to sue. *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing 'in no way depends on the merits of the [plaintiff's claim.]'" (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975))); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("[A]n injury-in-fact differs from a 'legal interest'; an injury-in-fact need not be capable of sustaining a valid cause of action . . . .").

Defendants also suggest that Allco's smaller facilities did not suffer an injury-in-fact because they were allowed to participate in a solicitation that was open only to smaller generators (*i.e.*, 2–20 megawatts of capacity), and because Allco's QFs still were still able to take advantage of PURPA's Section 210(a), which gives QFs a guaranteed right to sell their energy and capacity to utilities at the utilities' avoided cost. However, "the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing." *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (quoting *Denney*, 443 F.3d at 264). Moreover, Allco has plausibly alleged that the prize it sought through the 2015 RFP was distinct from the contracts it would have been able to secure through either of these avenues: the contracts that Allco's facilities would have been able to secure under Section 210 of PURPA would not have provided the long-term fixed-rate contract that was available through the 2015 RFP; and the RFP directed to smaller-capacity generators solicited bids for a smaller overall amount of generation.

in relation to these two particular injuries are (1) a declaration that the 2015 RFP is preempted by the FPA, and (2) an accompanying injunction halting any further action relating to the 2015 RFP and barring Defendants from issuing any future similar RFPs that are inconsistent with the FPA and PURPA. *Allco III* Compl. at 19; *Allco IV* Compl. at 15. We find that these forms of relief meet the Article III standing requirement for redressability, at least with regard to the injuries under discussion here.

Of course, if Allco's requested relief were granted, there is no guarantee that Connecticut would undertake yet another procurement (or a procurement that, given the relief sought, would be free from the alleged defects). The DEEP Commissioner has, however, already conducted two procurements, and Connecticut has articulated a commitment to obtaining more renewable energy generation for its regulated utilities in order to meet various environmental and energy goals. *See* 2013 CES at 76; *see also* Conn. Gen. Stat. Ann. § 16a-1 ("[T]he necessity of enacting the provisions of this chapter to provide for equitable distribution and conservation of energy is declared as a matter of legislative determination."); Brief for Appellee Klee, at 6–9. Nor is there any suggestion that the Connecticut statutes authorizing the DEEP Commissioner to initiate such renewable energy procurements would prevent the Commissioner from initiating future procurements that are free from the specific terms under consideration here

26

that allegedly injure Allco. For these reasons, we conclude that Allco has successfully shown that it is "substantially likely," *Utah v. Evans*, 536 U.S. 452, 460 (2002), that such future procurements would be conducted if its requested relief were granted—and that this is sufficient to show Article III redressability. *Cf. id*. at 463–64 (finding that the state of Utah had standing to challenge a census report, even though the requested relief could not directly remedy its claimed under-representation in the House of Representatives, because a victory for Utah would make it "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute," leading to a new, more favorable apportionment of representatives (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992))); *cf. also Alvin Lou Media Inc. v. FCC*, 571 F.3d 1, 6 (D.C. Cir. 2009) (explaining that a "disappointed bidder" may establish standing by showing that it is "ready, willing, and able to participate in a new auction should it prevail"); *U.S. Airwaves, Inc. v. FCC*, 232 F.3d 227, 232 (D.C. Cir. 2000) (identifying standing where a party demonstrated its willingness to participate "in a future reauction" of radio-wave spectrum).[11]

---

[11] *Allco II*, by comparison, held that Allco lacked standing for a claim "seek[ing] solely to invalidate the results of the challenged procurement and void its competitors' contracts," because "[t]o the extent that these claims seek only to invalidate the results of the prior procurement—and not also to require the Commissioner to conduct future procurements in compliance with PURPA—Allco lacks standing because that requested relief would not redress its injury, *i.e.*, its not being selected for a Section 6 contract." *Allco II*, 805 F.3d at 98.

2. Merits Analysis

Allco contends that the FPA vests FERC with exclusive jurisdiction over wholesale sales of electricity and that any action taken by states dealing with wholesale sales is preempted unless it falls within the limited grants of regulatory authority specified in PURPA. Allco argues that Connecticut, through its execution of the 2015 RFP, has exceeded the bounds of this limited grant in several ways. We find none of Allco's arguments sufficient to meet the standard set by Rule 12(b)(6), and therefore we affirm the dismissal of Allco's preemption claim.

a. "Compulsion" of Contracts Between Non-QFs and LSEs

First, Allco alleges that the 2015 RFP allows the DEEP Commissioner to "compel" and "force" utilities to enter into contracts with specified generators at specified rates, *Allco III* Compl. at ¶ 43,[12] and argues that "[c]ompelling a wholesale transaction—one that would not have taken place but for the State's compulsion—plainly involves the regulation of wholesale sales and thus falls

---

The claims that Allco makes in this case are different: its asserted injury is the allegedly unlawful charging of fees in RFPs and the exclusion of Allco's smaller facilities from participation in the 2015 RFP. Its requested remedy is also different: an injunction invalidating the 2015 RFP and forcing Connecticut authorities to comply with PURPA in future solicitations.

[12] Defendants reject this characterization, arguing that the Commissioner is only empowered under the 2015 RFP to direct utilities to negotiate at arms-length with winning bidders, and that the utilities are free to reject the terms offered in the selected proposals. *See Allco III* App. at 130; Oral Argument Recording at 16:30–19:45.

squarely within the field that Congress has occupied" in the FPA. Reply Brief 1–2. Allco asserts that Connecticut only has the power to compel its utilities to enter into wholesale interstate energy contracts if it does so within the bounds of the limited exception defined by Section 210 of PURPA. *Allco III* Compl. ¶ 45. This exception is, Allco alleges, restricted to contracts between utilities and QFs. *Id.* Because the 2015 RFP is open to non-QFs, Allco argues that the 2015 RFP cannot be permitted under the state's PURPA-power exception. *Id.* ¶ 45. As a result, Allco claims any action that the DEEP Commissioner takes under the 2015 RFP to "compel" utilities to contract with non-QF bidders violates the FPA. *Allco III* Compl. ¶¶ 41–45.

Plaintiff fails to provide factual allegations sufficient to support its contention that the 2015 RFP process entails the kind of "compulsion" that might sustain a preemption claim of this sort. *See Iqbal*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).

Specifically, although the authorizing statutes of the 2015 RFP permit the DEEP Commissioner to "direct" Connecticut utilities to "enter into" contracts with winning bidders, *see* 2013 Conn. Pub. Acts 13-303; 2015 Conn. Pub. Acts 15-107, the materials referenced in Allco's Complaints undermine Allco's contention that

such a "direction" amounts to "compulsion."[13] For instance, Connecticut's draft 2015 RFP, appended to the *Allco III* Complaint, as well as the final 2015 RFP, appended to the *Allco IV* Complaint, provide (a) that "[t]his RFP process, including any selection of preferred projects, *does not obligate any* [*utility*] *to accept any bid*," *Allco IV*. App. at 72 (emphasis added), *cf. Allco III* App. at 29, and (b) that the winning bidders "will enter into separate contracts with one or more [utilities] *at the discretion of the* [*utilities*]," *Allco IV* App. at 100, *cf. Allco III* App. at 49. *See also Allco IV* App. at 71 ("The [utilities] will be responsible for negotiation and execution of any final Power Purchase Agreement."); *cf. Allco III* App. at 28. This language makes clear, contrary to Allco's contention, that it is possible for a winning bidder to fail to reach an agreement with the utilities, or for an agreement to be terminated if a party is unable or unwilling to fulfill its terms—as apparently happened with Number Nine Wind. *See Allco*, 2016 WL 4414774, at *10. Thus, under these particular circumstances, the fact that the statutes authorize the DEEP Commissioner to "direct" utilities to "enter into" contracts with specific bidders is not sufficient to render plausible Allco's claim that utilities will be "compelled,"

---

[13] For the purpose of a motion to dismiss under Rule 12(b)(6), "'the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).

under the 2015 RFP, to accept specific bids. We therefore reject Allco's preemption argument premised on this theory.

b. Comparison to *Hughes v. Talen Energy Marketing, LLC*

Allco argues, however, that Connecticut's RFP process is "economically identical," Brief of Appellant 53 n.11, to a Maryland regulatory scheme which the Supreme Court recently determined was preempted by the FPA in *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016). We are not convinced, and find *Hughes* distinguishable from the case before us.

*Hughes* involved capacity auctions administered by PJM Interconnection (PJM), an RTO that oversees the electricity grid in all or parts of thirteen mid-Atlantic and Midwestern States, as well as the District of Columbia. *Id.* at 1293. "FERC extensively regulates the structure of the PJM capacity auction to ensure that it efficiently balances supply and demand, producing a just and reasonable clearing price." *Id.* at 1294. "Exercising this authority, FERC has approved the PJM capacity auction as the sole ratesetting mechanism for sales of capacity to PJM, and has deemed the clearing price *per se* just and reasonable." *Id.* at 1297.

Around 2009, Maryland became concerned that the PJM capacity auction was failing to encourage development of enough new in-state electricity generation capacity. *Id.* at 1294. Maryland regulators therefore proposed that FERC revise the rules of the PJM auction to guarantee new generators longer-term assurance of a

stable capacity price. *Id*. After FERC rejected the proposal on the ground that it would "improperly favor new generation," Maryland promulgated an order soliciting proposals from companies for construction of a new gas-fired power plant. *Id*. Maryland, thereupon, accepted the proposal of CPV Maryland, LLC ("CPV"), and "required" utilities to enter into a twenty-year "contract for differences" with CPV at a rate CPV specified in its proposal. *Id*. "Unlike a traditional bilateral contract for capacity, the contract for differences does not transfer ownership of capacity from CPV to the LSEs. Instead, CPV sells its capacity on the PJM market, but Maryland's program guarantees CPV the contract price rather than the auction clearing price." *Id.* at 1295.[14] The Supreme Court found the scheme to be preempted: "Maryland—through the contract for

---

[14] As the Supreme Court explained:

> If CPV's capacity clears the PJM capacity auction and the clearing price falls below the price guaranteed in the contract for differences, Maryland LSEs pay CPV the difference between the contract price and the clearing price. The LSEs then pass the costs of these required payments along to Maryland consumers in the form of higher retail prices. If CPV's capacity clears the auction and the clearing price exceeds the price guaranteed in the contract for differences, CPV pays the LSEs the difference between the contract price and the clearing price, and the LSEs then pass the savings along to consumers in the form of lower retail prices.

*Hughes*, 136 S. Ct. at 1295.

differences—requires CPV to participate in the PJM capacity auction, but guarantees CPV a rate distinct from the clearing price for its interstate sales of capacity to PJM. By adjusting an interstate wholesale rate, Maryland's program invades FERC's regulatory turf." *Id.* at 1297.

In response to Maryland's argument that the contract for differences "is indistinguishable from traditional bilateral contracts for capacity," *id.* at 1299, the Court determined that

> the contract at issue here differs from traditional bilateral contracts in this significant respect: The contract for differences does not transfer ownership of capacity from one party to another outside the auction. Instead, the contract for differences operates within the auction; it mandates that LSEs and CPV exchange money based on the cost of CPV's capacity sales to PJM.

*Id*. at 1299.

The Court noted, however, that

> [o]ur holding is limited: We reject Maryland's program only because it disregards an interstate wholesale rate required by FERC. . . . Nothing in this opinion should be read to foreclose Maryland and other States from encouraging production of new or clean generation through measures untethered to a generator's wholesale market participation. So long as a State does not condition payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable.

*Id*.

There are, we believe, important and telling distinctions between the Maryland program and Connecticut's RFPs. While Maryland sought essentially to override the terms set by the FERC-approved PJM auction, and required transfer of ownership through the FERC-approved auction, Connecticut's program does not condition capacity transfers on any such auction. Connecticut, instead, transfers ownership of electricity from one party to another by contract, independent of the auction. Moreover, the contracts at issue in the case before us are the kind of traditional bilateral contracts between utilities and generators that are subject to FERC review for justness and reasonableness under *Morgan Stanley*, 554 U.S. at 547–48. They are, in other words, precisely what the *Hughes* court placed outside its limited holding. *See Hughes*, 136 S. Ct. at 1299.

Indeed, and significantly, the 2015 RFP requires that any bilateral contract that results from that process be subjected to review by FERC for justness and reasonableness. *Allco IV* App. at 103 ("Any FERC-jurisdictional Rate Schedule or Tariff and Service Agreement agreed upon by an eligible bidder and the applicable [LSEs] will be filed with FERC under Section 205 of the Federal Power Act [codified at 16 U.S.C. § 824(a)]. The FERC must accept the filing before the Rate Schedule or Tariff and Service Agreement can become effective."). Because FERC has the ability to review any bilateral contracts that arise out of Connecticut's RFPs, we hold that Connecticut's 2015 RFP—insofar as it allows the DEEP

34

Commissioner to direct (but not compel) utilities to enter into agreements (at their discretion) with generators, including non-QFs—is not preempted by the FPA.

Allco, in response, points to *PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014) ("*Solomon*"), *cert. denied*, 136 S. Ct. 1728 (2016), to argue that the contracts' being subjected to *ex-post* FERC review does not defeat Allco's preemption claim. In *Solomon*, New Jersey attempted to encourage the building of new power plants by enacting a statute that "authorized the Board of Public Utilities to compel electricity distribution companies to sign" fifteen-year contracts with new generators to purchase a predetermined amount of capacity at a predetermined rate. *Id.* at 248. The defenders of the statute argued that "if the [contracts] set capacity prices then the law would not be preempted because the reasonableness of the Agreement's rates would be within FERC's exclusive jurisdiction to review." *Id.* at 253. The Third Circuit rejected this argument, determining that it

> conflates the inquiry into [the New Jersey law's] field of regulation with an inquiry into the reasonableness of the [compelled contract rates]. Here, whether the [contracts] pick "just and reasonable" capacity prices is beside the point. What matters is that the Agreements have set capacity prices in the first place.

*Id.* at 253.

*Solomon*, however, differs from the case before us now in at least three important respects. First, the Third Circuit's reasoning pre-dates the Supreme

Court's decision in *Hughes*, which now controls. Second, the plaintiffs in *Solomon* successfully alleged that the utilities were "compel[led]" to enter into capacity contracts on terms chosen by state agencies. *Id.* at 248–49. As we stated earlier, Allco failed plausibly to make such an allegation. Third, the Third Circuit's finding of field preemption was based specifically on the fact that New Jersey "command[ed] generators to sell capacity" into the FERC-approved interstate auction, and "[i]n return, New Jersey's statute ensures that the generators will receive the Standard Offer Capacity Rate for each quantity of capacity offered at auction and not solely the auction price they would have otherwise received." *Id.* at 252–53. Thus, the New Jersey scheme, like the Maryland scheme at issue in *Hughes*, suffered the "fatal defect" of having the state "condition payment of funds on capacity clearing the [FERC-approved interstate] auction." *Hughes*, 136 S. Ct. 1299.

Because we do not think the Connecticut RFP program outlined in the 2015 RFP and its authorizing statutes are at odds with *Hughes* or inconsistent with *Solomon*, we reject Allco's preemption arguments based on these cases.[15]

---

[15] We are, of course, not bound by *Solomon*. And so we express no opinion here about whether, if the Connecticut agencies truly had "compelled" utilities to enter contracts with generators on specified terms, review by FERC of such bilateral contracts would be sufficient to defeat any preemption claim. Allco did not successfully place this proposition before us, and Defendants have not argued it.

c. The Terms of the 2015 RFP, and its Potential Indirect Effect on

Wholesale Prices

Allco also argues that the very structure of the 2015 RFP amounts, in several ways, to a regulation of the wholesale interstate energy market that is outside the exception contemplated by PURPA. We find these arguments unconvincing as well.

Specifically, Allco claims that the 2015 RFP exceeds the bounds of PURPA insofar as it charges fees not contemplated by PURPA, excludes bids from Allco's QFs with less than 20 megawatts of capacity, and directs utilities to enter into contracts with non-QF generators. We find, however, that the 2015 RFP process—as detailed in the 2015 RFP itself and in its authorizing statutes—is, without more, a permissible exercise of the power that the FPA grants to Connecticut to regulate its LSEs. That is, we hold that it is permitted, apart from the PURPA exception.

"[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983); *see New York v. FERC*, 535 U.S. 1, 24 (2002) ("FERC has recognized that the States retain significant control over local matters even when retail transmissions are unbundled."); *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 417 (2d Cir. 2013) ("[S]tates have broad powers under state law to direct the planning and

resource decisions of utilities under their jurisdiction. States may, for example, order utilities to build renewable generators themselves, or . . . order utilities to purchase renewable generation." (quoting *S. Cal. Edison Co., San Diego Gas & Elec. Co.*, 71 FERC ¶ 61,269, at *8 (June 2, 1995) (alteration in original))); FERC Stats. & Regs., Regs. Preambles, Jan. 1991–June 1996, ¶ 31,036, p. 31,3782, n.544, 61 Fed. Reg. 21,540, 21,736 (1996) ("This Final Rule will not affect or encroach upon state authority in such traditional areas as the authority over local service issues, including reliability of local service; administration of integrated resource planning and utility buy-side and demand-side decisions, including [demand-side management]; authority over utility generation and resource portfolios; and authority to impose non-bypassable distribution or retail stranded cost charges."). Accordingly, we believe that it is settled law that specifying the sizes and types of generators that may bid into the 2015 RFP, as well as the charging of fees to bidders, without more, lies well within the scope of Connecticut's power to regulate its utilities.

Allco, though, asserts that the contracts that will arise from the 2015 RFP will increase the supply of electricity available to Connecticut utilities, that this will place downward pressure on the "avoided cost" that Allco's QFs will be able to receive under Section 210 of PURPA, and that this pressure will have an effect on *wholesale* prices, thereby infringing upon FERC's regulatory authority. This

incidental effect on wholesale prices does not, however, amount to a regulation of the interstate wholesale electricity market that infringes on FERC's jurisdiction. *See Hughes*, 136 S. Ct. at 1298 ("States, of course, may regulate within the domain Congress assigned to them even when their laws incidentally affect areas within FERC's domain."); *cf. EPSA*, 136 S. Ct. at 776 ("When FERC . . . takes virtually any action respecting wholesale transactions—it has some effect, in either the short or the long term, on retail rates. That is of no legal consequence."); *Hughes*, 136 S. Ct. at 1300 ("[T]he Federal Power Act, like all collaborative federalism statutes, envisions a federal-state relationship marked by interdependence. Pre-emption inquiries related to such collaborative programs are particularly delicate. . . . [W]here coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one." (Sotomayor, *J.*, concurring) (internal quotation marks and citations omitted)).

Thus, Allco has not successfully alleged that the 2015 RFP is likely to produce contracts that violate the bright line laid out in *Hughes*: the RFPs do not, for instance, require bids that are "[]tethered to a generator's wholesale market participation" or that "condition[] payment of funds on capacity clearing the auction." *Id.* at 1299 (majority opinion).

39

For all the above reasons, we therefore affirm the district court's dismissal of Allco's preemption claims pursuant to Rule 12(b)(6), as well as its denial of Allco's requests for injunctive relief as moot.

**C. Dormant Commerce Clause Claim**

The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. In implementing the Commerce Clause, the Supreme Court "has adhered strictly to the principle that the right to engage in interstate commerce is not the gift of a state, and that a state cannot regulate or restrain it." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 808 (1976) (internal quotation marks omitted). It follows from this principle that "the negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009) ("*Selevan I*") (internal quotation marks, brackets, and citations omitted).

Allco's claim rests on two asserted injuries. First, Allco contends that Connecticut discriminates against Allco's Georgia facility because it does not let that facility's RECs count towards the utilities' RPS requirements. Second, Allco argues that Connecticut discriminates against Allco's New York facility because

the RPS program requires producers of RECs in adjacent control areas to pay transmission fees in order to sell their RECs to Connecticut utilities.

Specifically, Allco asserts that Connecticut's RPS program violates the "dormant" aspect of the Commerce Clause because it "facially discriminates . . . [and] has the purpose or the effect of discriminating" against Allco's facility in Georgia and its facility in New York, and Allco requests a declaratory judgment to that effect. *Allco III* Compl. at ¶ 64.

1. Standing Analysis

Allco has standing to challenge Connecticut's RPS program under the dormant Commerce Clause for reasons analogous to those we have discussed above. The RPS program's differential treatment of RECs produced by Allco's Georgia's facility, as well as the additional fees that Allco's New York facility must pay, clearly injure Allco, and a finding that the RPS program violates the dormant Commerce Clause would give Allco redress.

2. Merits Analysis

"In analyzing a challenged local law under the dormant Commerce Clause, we first determine whether it clearly discriminates against interstate commerce in favor of intrastate commerce, or whether it regulates evenhandedly with only

41

incidental effects on interstate commerce." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007).

"We then apply the appropriate level of scrutiny. A law that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid *per se* and will survive only if it is 'demonstrably justified by a valid factor unrelated to economic protectionism.'" *Id*. at 47 (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992)). That is, such a law is valid "only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 101 (1994)).

Where, instead, a state law is nondiscriminatory, but nonetheless adversely affects interstate commerce "incidental[ly]," we employ a deferential balancing test. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Such a law will be sustained unless "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Id.*; *accord N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y.*, 850 F.3d 79, 89 (2d Cir. 2017).

We address each of Allco's asserted injuries—both of which it claims violate the dormant Commerce Clause—in turn.

### a. Alleged Discrimination Against Allco's Georgia Facility

Insofar as Allco argues that the RPS program discriminates against Allco's Georgia facility, and the RECs it produces, Connecticut responds by saying that: "RECs are inventions of state property law," *Wheelabrator Lisbon*, *Inc.*, 531 F.3d at 186, and because the RECs produced by Allco's Georgia facility do not meet the legal requirements of Connecticut's RPS program, *see* Conn. Gen. Stat. § 16-245a(b), the two types of RECs are different products. Connecticut's RPS program therefore does no more than treat different products differently in a nondiscriminatory fashion.[16] As such, Connecticut asserts, there is no discrimination under the dormant Commerce Clause. We agree, and therefore apply the more deferential balancing test under *Pike*, concluding that the RPS program passes that test.

---

[16] Defendants also argue that because ninety percent of the RECs used to satisfy the Connecticut RPS come from out-of-state, *i.e.*, from nearby states, the RPS program's requirements do not burden interstate commerce. Allco, however, correctly points out that the dormant Commerce Clause prevents regional economic balkanization as well as state-by-state balkanization. *See Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985) ("There can be little dispute that the dormant Commerce Clause would prohibit a group of States from establishing a system of regional banking by excluding bank holding companies from outside the region if Congress had remained completely silent on the subject.").

"Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298–99 (1997). Thus,

> when the allegedly competing entities provide different products . . . there is a threshold question whether the companies are indeed similarly situated for constitutional purposes. This is so for the simple reason that the difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed.

*Id*. at 299.

In *Tracy*, the Supreme Court considered whether two allegedly similar products were, nonetheless, substantially different for the purposes of the dormant Commerce Clause because they served two different markets. These were: (1) natural gas that was sold primarily to small residential customers and was "bundled with . . . services and protections" to ensure reliability and stable rates, and (2) "unbundled" natural gas that was purchased by large, bulk buyers like General Motors, who typically did not need the same protections. *Id.* at 297; *see id.* at 301–03.

Ohio imposed a sales tax on in-state sales of goods, including natural gas, and a parallel use tax on goods purchased out-of-state for use in Ohio. *Id.* at 281–83. Ohio, however, exempted from the sales tax state-regulated natural gas utilities, which had traditionally served the market of Ohio customers who, being in a sense

44

"captive," had to purchase bundled natural gas, and could do so only from the state-regulated utilities. *Id*. at 301. As the natural gas market evolved, however, it became possible for Ohio consumers to buy "unbundled" natural gas from independent—often interstate—marketers. *Id*. at 283–85. General Motors—and other customers—began to purchase its gas in this way from independent non-state-regulated marketers. It was therefore charged the general use tax. *Id*. at 285. General Motors sued the Ohio Tax Commissioner, arguing that denying a tax exemption to such independent non-state-regulated marketers violated the dormant Commerce Clause. *Id*.

In determining whether this differential treatment of state-regulated public utilities and independent marketers violated the dormant Commerce Clause, the Court first found that the "noncaptive market"—*i.e.*, the customer base with an appetite for unbundled natural gas—and the "captive" market were distinct. *Id*. at 297–98. The Court found that, as far as the "captive" market was concerned, competition would not be served by eliminating a tax differential between the two types of sellers, because independent marketers were unlikely to provide the "bundled" product that residential customers needed. *Id*. at 301. In the non-captive market, however,

> the respective sellers of the bundled and unbundled
> products apparently do compete and may compete
> further. Thus, the question raised by this case is whether
> the opportunities for competition between marketers and

45

[utilities] in the noncaptive market requires treating marketers and utilities as alike for dormant Commerce Clause purposes. Should we accord controlling significance to the noncaptive market in which they compete, or to the noncompetitive, captive market in which the local utilities alone operate?

*Id*. at 303–04.

Although the Court found that there is "no *a priori* answer" to this question, it said that "a number of reasons support a decision to give the greater weight to the captive market and the local utilities' singular role in serving it, and hence to treat [independent] marketers and [utilities] as dissimilar for present purposes." *Id*. at 304.

The Court found it particularly relevant that, if the state-regulated utilities were forced to compete on a level playing field with interstate marketers, this would increase competition between the two kinds of sellers in the noncaptive market, and this, in turn, would jeopardize the utilities' "ability to continue to serve the captive market where there is no such competition." *Id*. at 307. The Court then said:

[This] conclusion counsels against taking the step of treating the bundled gas seller like any other, with the consequent necessity of uniform taxation of all gas sales.

*Id*. at 309.

The continuing importance of the States' interest in protecting the captive market from the effects of competition for the largest customers is underscored by

46

the common sense of our traditional recognition of the need to accommodate state health and safety regulation in applying dormant Commerce Clause principles.

*Id*. at 306.

Congress, the Court indicated, recognized the States' power to regulate and protect the provision of natural gas for their citizens. *Id*. at 309. The Court concluded that

Ohio's regulatory response to the needs of the local natural gas market has resulted in a noncompetitive bundled gas product that distinguishes its regulated sellers from independent marketers to the point that the enterprises should not be considered "similarly situated" for purposes of a claim of facial discrimination under the Commerce Clause.

*Id*. at 310. General Motors's argument that the state discriminated between regulated utilities and unregulated marketers therefore failed. *Id*.

This action likewise addresses state laws that raise questions regarding the "comparability of taxed or regulated entities as operators in arguably distinct markets." *Id*. at 300. *Tracy* thus provides the appropriate framework for determining whether Connecticut's RPS program "clearly" discriminates against interstate commerce, and is subject to strict scrutiny, *Southold*, 477 F.3d at 47, or whether it merely has an indirect adverse effect on interstate commerce, and should be subjected to the more permissive balancing test under *Pike*. *Tracy* also gives

47

general guidance on whether a program like Connecticut's should survive dormant Commerce Clause analysis.

Accordingly, we first ask whether the allegedly competing entities—Allco's Georgia generator, on the one hand, and generators located in ISO-NE and adjacent control areas, on the other—provide different products, *i.e.*, different RECs. We find that they do. "RECs are inventions of state property law," *Wheelabrator Lisbon, Inc.*, 531 F.3d at 186, and Connecticut has invented a class of RECs that differs from Allco's Georgia facility's RECs, *see* Conn. Gen. Stat. § 16-245a(b). The two products can, therefore, be treated as different, even though they—like the unbundled and bundled gas products in *Tracy*—also have some underlying similarities.

Second, we ask whether there is a market that only one of the two entities serves, and in which competition would not be increased if the differential treatment of the two entities were removed. We answer this question in the affirmative as well.

Connecticut consumers' need for a more diversified and renewable energy supply, accessible to them directly through their regional grid or indirectly through adjacent control areas, would not be served by RECs produced by Allco's facility in Georgia—which is unable to transmit its electricity into ISO-NE. Further, this market's "characteristics"—most importantly, the boundaries of the electrical grid

to which Connecticut has direct or indirect access—"appear to be independent of any effect attributable to the State's" RPS program. *Tracy*, 519 U.S. at 286.

In other words, the RPS program's definition of qualifying RECs appears to be a response to, rather than a cause of, the fact that Connecticut has direct access only to electricity on the ISO-NE grid, and indirect access only to electricity imported from adjacent control areas. Thus, "there is good reason to assume that any pricing changes that could result from eliminating the [differential treatment of Allco's Georgia generator] challenged here would be inadequate" to serve the goals that Connecticut properly is pursuing. *Id*. This suggests that competition would not be served by treating the different types of REC producers similarly.

Third, we ask whether there is also a separate market in which these two types of producers compete, and in which competition potentially would be served if Connecticut were prohibited from treating them disparately. The answer is yes. Defendants admit that there is a national market for RECs that does not distinguish between RECs on the basis of their geographic origin.[17] In this market, "the respective sellers . . . apparently do compete and may compete further." *Tracy*, 519 U.S. at 303. Eliminating Connecticut's RPS program's differential treatment

---

[17] As the PURA Defendants explain, "Connecticut's law does not ban out-of-region RECs. Plaintiff's RECs can be sold to any Connecticut entity wishing to buy them, at whatever price the market will bear. Plaintiff's Georgia RECs could, for example, be purchased in Connecticut by a company wishing to green its image." Brief for Appellees Betkoski *et al*. 55.

"might well intensify competition . . . for customers in this [national] market." *Id.* This, of course, cuts in favor of treating the products as alike.

Following the Court's analysis in *Tracy*, we resolve this dilemma by asking whether the opportunity for increased competition between REC producers in the national market necessitates treating REC-producers in Georgia and New England alike for dormant Commerce Clause purposes, or whether the needs of Connecticut's local energy market permits treating the two types of REC producers differently. That is, should we give "controlling significance" to the market in which the two types of REC producers compete, or to the market served only by REC producers that can connect to Connecticut's power grid? *Id.* As in *Tracy*, we find that "[a]lthough there is no *a priori* answer, a number of reasons support a decision to give greater weight" to the market for RECs that are produced by generators able to connect to Connecticut's grid, *id.* at 304, and hence to treat those generators and Allco's Georgia generator as dissimilar for dormant Commerce Clause purposes.

It is here that the more general language in *Tracy* gives us guidance. Just as the *Tracy* Court recognized the importance of Ohio's interest in protecting the captive natural gas market from the effects of competition in order to promote public health and safety, *id.* at 306–07, so must we here recognize the importance of Connecticut's interest in protecting the market for RECs produced within the

ISO-NE or in adjacent areas. Connecticut's RPS program serves its legitimate interest in promoting increased production of renewable power generation in the region, thereby protecting its citizens' health, safety, and reliable access to power.

These means and ends are well within the scope of what Congress and FERC have traditionally allowed the States to do in the realm of energy regulation. *See New York v. FERC*, 535 U.S. at 24 ("FERC has recognized that the States retain significant control over local matters even when retail transmissions are unbundled."); *Ark. Elec. Co-op. Corp.*, 461 U.S. at 377 ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States."); *Entergy Nuclear,* 733 F.3d at 417 ("'[S]tates have broad powers under state law to direct the planning and resource decisions of utilities under their jurisdiction. States may, for example, order utilities to build renewable generators themselves, or . . . order utilities to purchase renewable generation.'") (quoting *S. Cal. Edison Co.*, 71 FERC ¶ 61,269, at *8) (alteration in original).

Significantly, we note that Connecticut's RPS program makes geographic distinctions between RECs only insofar as it piggybacks on top of geographic lines drawn by ISO-NE and the NEPOOL-GIS, both of which are supervised by FERC—not the state of Connecticut. It is FERC that has created the geographic distinctions on which Connecticut's program is predicated by organizing owners of

transmission lines into "independent system operators" (ISOs), such as ISO-NE, and "regional transmission organizations" (RTOs) in order "to help manage the grid, ensure system reliability, and guard against discrimination and the exercise of market power in the provision of transmission services." *Entergy Nuclear*, 733 F.3d at 413.

The NEPOOL, moreover, is governed through a committee structure expressly approved by FERC. *See N. Eng. Power Pool*, 88 FERC ¶ 61079, 61181. It is through the incorporation of NEPOOL's GIS Rule 2.7(c)—which permits NEPOOL to track RECs produced in ISO-NE and adjacent control areas—that Connecticut's RPS program defines the outer bounds of the geographic region within which qualifying RECs must be produced. *See* Conn. Gen. Stat. § 16-245a.

In other words, it is FERC itself that has instituted a sort of regionalization of the national electricity market. And neither FERC nor Congress has given any indication that this structure is unduly harmful to interstate commerce. Congress and FERC are better-situated than the courts to supervise and to determine the economic wisdom and the health and safety effects of these geographic boundaries that Connecticut has incorporated into its RPS program. It is they that, in this setting, are best suited to decide which products ought to be treated similarly, and which should not.

And since, as the Court stated in *Tracy*, such "health and safety considerations [may] be weighed in the process of deciding the threshold question whether the conditions entailing application of the dormant Commerce Clause are present," 519 U.S. at 307, we conclude, analogously to the Court's decision in *Tracy*, that Connecticut's regulatory response to the needs of the local energy market has resulted in a noncompetitive REC product that is capable of being produced only by in-region generators, and that this distinguishes such generators from Allco's Georgia generator "to the point that the enterprises should not be considered 'similarly situated' for purposes of a claim of facial discrimination under the Commerce Clause." *Id.* at 310.

Having reached this conclusion, and for the same reasons discussed above, it is clear that the burden imposed by Connecticut's RPS program is also not "clearly excessive in relation to the putative local benefits," and therefore passes the more permissive *Pike* test. *Pike*, 397 U.S. at 142; *see United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007) (holding that, under *Tracy*, a state law did not discriminate against interstate commerce, and that the law therefore was "properly analyzed under the test set forth in *Pike*"). "We have consistently recognized the legitimate state pursuit of such interests as compatible with the Commerce Clause, which was 'never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens,"

53

even if that "legislation might indirectly affect the commerce of the country.'"

*Tracy*, 519 U.S. at 306–07 (quoting *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443–44 (1960)).

Allco's argument that Connecticut's RPS program discriminates between its Georgia renewable energy generator and in-region renewable energy generators therefore fails, and the district court's dismissal of this claim must be affirmed.

### b. Alleged Discrimination Against Allco's New York Facility

With respect to Allco's claim that its New York facility has suffered discrimination because it has had to pay transmission fees in order for its RECs to qualify under the RPS program, we determine that Allco has failed sufficiently to plead that such charges are anything more than use fees, analogous to road tolls, which regularly pass constitutional muster. *See, e.g.*, *Nw. Airlines, Inc. v. Cty. of Kent*, 510 U.S. 355, 362–63 (1994); *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 261 (2d Cir. 2013) ("*Selevan II*"). To state a claim for a violation of the dormant Commerce Clause in such circumstances, Allco must plead sufficient facts to "allow[] the court to draw the reasonable inference," *Iqbal*, 556 U.S. at 678, that "the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *Selevan I*, 584 F.3d at 95 (quoting *United Haulers*, 550 U.S. at 346).

Among the facts that would be relevant to such a claim would be the amounts charged to Allco's New York facility to import its electricity into ISO-NE, and facts relating to any putative local benefits that may be derived from such charges. *Cf. Selevan I*, 584 F.3d at 95. Allco's conclusory allegations do not allow us to make any inferences of excessive burden. We therefore affirm the district court's dismissal of Allco's dormant Commerce Clause claim with respect to its New York facility.

**D. Leave To Amend**

Allco finally argues that the district court erred in dismissing its Complaints without affording it leave to amend. Allco never sought that opportunity with respect to the portions of its Complaints discussed above. "While leave to amend under the Federal Rules of Civil Procedure is freely granted, no court can be said to have erred in failing to grant a request that was not made." *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (internal quotation marks and citations omitted).

**III. CONCLUSION**

The district court's judgment is AFFIRMED.